IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


ROBERT L. BUTLER                                                                    PLAINTIFF

          v.                          Civil No. 03-1175

JAMES ROBINSON, Sheriff, Ashley
County, Arkansas;  JIM CULP,
Investigator, Ashley County Sheriff's
Department; and  CALVIN FRIERSON,
City of Hamburg, Arkansas, Police Department,

                                                                              DEFENDANTS


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the undersigned for report and recommendation is the civil rights complaint filed

by Robert L. Butler, currently an inmate Winn Correctional Center, Winnfield, Louisiana.  Butler

proceeds pro se and *in forma pauperis*.

While detained at the Ashley County Jail (ACJ), Butler contends his constitutional rights

were violated in the following ways:  (1) excessive force was used against him by Calvin

Frierson during an incident that occurred at the jail on June 4, 2003; (2) he was denied adequate

medical care; and (3) he was subjected to unconstitutional conditions of confinement.

An evidentiary hearing was conducted on July 28, 2005.  At the conclusion of the

hearing, the matter was taken under advisement pending the preparation of this report and

recommendation.

The parties waived closing argument but were advised that they could submit written

materials to the court.  As long as those materials were received prior to the issuance of this

report and recommendation, the parties were advised that the materials would be considered.

-1-

Plaintiff filed an objection to the testimony of Calvin Frierson (Doc. 62), a supplement to the hearing testimony (Doc. 63), and submitted five additional letters to the court. The letters are attached to this report and recommendation as exhibits A (dated August 22, 2005, and marked received on August 25th), B (undated but marked received September 1, 2005), C (dated September 6, 2005, and marked received on September 9th), D (dated September 11, 2005, and marked received September 14th), and E (dated September 11, 2005, and marked received September 15th).

## I. BACKGROUND and EVIDENCE PRESENTED

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize the testimony given.

### Testimony of Stephen J. Shaw

I have been in the ACJ on several occasions. I was in the ACJ on June 4, 2003.

I was detained there from March 15, 2003, until August 14, 2003. I believe that is about right. That is the last time I was in there.

I was in bull pen 3 (BP3). It was a ten man pod. There were eight or nine people in there.

I was under a lot of stress. I was not behaving like I should have been. I knocked the window out of the door. I knocked lights out. There was a light protector on the light. I broke it off. I jumped up and down on the table.

I pulled up a lot of things. I believe I may have had help tearing up the pod but I don't recall who it was.

AO72A
(Rev. 8/82)

I tore the table off the floor.  *See Deft's Ex.* 12.[1]  The table was bolted to the floor.  The table weighed about one hundred and fifty pounds.  I would have had trouble tearing it up myself so I may have had assistance ripping it from the floor but I don't recall who helped.

I started a fire in the trash can and set it by the vent.  I took a lock, I don't recall where I had gotten it, and kept it tied up in a pair of pants.  I took a folding chair and broke the legs off to use as weapons.  *See Deft's Ex.* 10.  The rest of the chair could have been used as a frisbee or a shield.  *Id.*  I don't recall where the chair came from.

We covered the camera in the pod.  We were trying to keep the jailers from seeing what we were doing.

There was most definitely disorder that day.  We were excited, angry, and we got carried away.

There may have been an issue over water that day.  They would bring us water.  Its been a couple of years.  We didn't dehydrate and die.  We knew how to get water–by asking jailers for it.

There was water in the pod.  The toilet was flooded.  I believe an inmate did it.  I didn't do it all myself.  There was an effort made to flood the pod and it worked.  I believe some of the water also came from the shower.

At one point in time, there had been a problem with the plumbing and we were taken from our pod to the main bathroom to shower.  The problem was fixed after a week or two.

---

[1]Exhibits submitted by separate defendant Frierson will simply be referred to as Defendant's Exhibits (*Deft's Ex.*) followed by the appropriate number.  Exhibits submitted by separate defendants Sheriff James Robinson and Jim Culp will be referred to as County Defendants' Exhibits (*Cty. Defts' Ex.*) followed by the appropriate number.

AO72A
(Rev. 8/82)

I believe we could drink water from the faucet. It is an old jail. Things break down. If they were having to bring us water, I assume the faucet must have been broken at this time.

The jail administrator, Jim Culp, came into the pod. He tried to get it under control. He said to come out one at a time. It would have been procedure for there to have been a shakedown of the inmates and the pod.

He came in maybe two or three times to get things under control. Nobody was going outside. We were all going to stay in there. We wouldn't go outside. Our response was pretty much for him to get on out of the cell as quickly as he came in there. It would have been a group deal.

There is no telling why we were doing this. We may have just been restless.

I believe Culp was accompanied by Deputy Hughes at one point, Deputy Vorhease at one point, and I believe Sheriff Robinson even came to the door at one point and tried to talk to us. Again this was a couple of years ago but I believe what I'm saying is fairly accurate.

With the lights out, it was fairly dark in the pod. I know the lights were out by the time the officers entered the pod to take control. The officers came into the pod at somewhere between five and seven that evening. The disorder had been going on for a good hour maybe longer.

The officers came in the room striking us. The officers had flashlights.

We had all lined up at the back wall at the very back of the cell. *See Deft's Ex.* 12. We were in a straight line. I was in the far right hand corner standing about by the little pole.

We were standing holding the mattresses up as shields. I had a metal pipe in my hand. Several people were pretty excited. We were getting ready to fight.

-4-

They told us to drop the mattresses and the pipes. It was decided we were "fixing to fight." There may have been some movement by both sides. It was a couple of years ago. It seems like there may have been some kind of fighting.

I didn't see anyone hit Butler. As the deputies came forward, I was focusing more on the deputies than the inmates. I was looking forward. I was worried about what was going on with me.

I believe I may have tried to use the pipe. One time while I was at the ACJ, I tried to hit a fellow in the face with the end of a broom. I stayed in so much trouble there I don't recall if that was the same day. It would be an understatement to call me a trouble maker.

As the officers were coming towards us, they asked us to submit to being handcuffed. We said: "To get the f— out of here. We ain't leaving. F— you."

We were subdued, placed in handcuffs and carried out into the hallway. I know a deputy was injured and one or two of the inmates from the pod. They got us all out of the cell. I believe a deputy and two inmates went to the hospital.

I may have gotten a few scrapes that night. When you try to fight the police, injury usually occurs.

I didn't share a pod with Butler that night. I was moved to the other side.

I was charged with aggravated riot and could have gotten ten years. I pled guilty to obstruction governmental operations as a result of the incident.

### Testimony of Jonathan Liles

I work for the Ashley County Sheriff's Department. I'm a jailer.

I was hired on May 6, 2003. I was in that position on June 4, 2003.

On June 4, 2003, when I came in to the jail everything was said and done. Butler, another inmate, and a deputy were being transported to the hospital. I don't know what led up to the incident. I did notice the next day that Butler's head was bandaged up.

The jail policy with respect to medical needs is that if an inmate has something wrong with him and needs medication attention we give him a medical request form. They fill it out and sign it and return it to us. The jailer then puts the request in the jail administrator's box. The jail administrator then makes an appointment or gives a response letting the inmate know what he is going to do or when the appointment is going to be. We don't have a jail nurse or doctor. Sometimes the jail administrator asks us questions about the inmate. Once I get a medical request form, I try to hurry up and get it to the jail administrator.

Jailers can't do anything on their own. We do have certain over-the-counter medication like Ibuprofen and Aspirin we can give.

It seems like Butler submitted requests about his head or headaches. I turned in the request forms that he gave to me. For a headache, we can give Ibuprofen or Aspirin every four to six hours.

The jailers watch the entire jail. You make sure the inmates are fed and dispense medication, Ibuprofen, ice, water, toilet paper, and clean clothes. Inmates were provided water on a regular basis and got water with each meal. We had milk jugs of water in the refrigerator. We poured the cold water out of those jugs for the inmates.

Prior to June 4, 2003, we had at least six milk jugs of water in the freezer. Whenever they asked for it, we would go pour them water. After June 4th, the procedure changed. In each

-6-

cell we had a five gallon jug with water and ice every day. They didn't have to rely on us. *See Defts' Ex.* 9. When it is empty, we fill it back up.

There was running water in BP3. There was a shower and toilet. At one point, there was something wrong with the shower and we were waiting on a part to fix it. It was probably broken for two or three weeks.

I provided Butler Ibuprofen. He was always saying something was wrong but then he would sit back and play dominos or he would be walking around. I provided him with Ibuprofen when he requested it.

I also remember giving him hot compresses. We took towels, soaked them in water, put them in the microwave, and gave them back to him.

In late August of 2003, Butler went to Dr. Henry to be evaluated. I don't recall what the outcome of the visit was. Butler was transferred in September of 2003.

That isn't my signature on the letter dated August 5, 2003. *See Plff's Ex.* 5 at p. 20. I don't know what that letter is. It isn't my signature on letters dated July 29, 2003, or August 6, 2003.[2] *Id.* at p. 23 & p. 22.

Butler did give me a number of medical request forms. I don't recall exactly how many. I'd estimate ten--numerous forms.

The original forms go to the jail administrator. We turn them into the jail administrator to get a response. The request forms that were submitted by me are in the file.

---

[2]Butler maintains this witness and others committed perjury. Butler asks for a handwriring examination of this witness. Doc. 62 filed August 16, 2005.

I remember getting some grievances from Butler. I turned the grievances into the jail administrator's box. Culp made the decision on them.

I don't recall receiving any grievances where he was complaining about the conduct of Frierson on June 4, 2003. Butler never told me to give a complaint to anyone at the police department.

Sometimes I made copies for the inmates of the grievances. It was standard practice to make a copy of the grievance and give it back. I was never told not to make any more copies. I don't recall if I made a copy for Butler.

### Timothy Brad McGhee

In June of 2003, I was employed with the Ashley County Sheriff's Office as a deputy. I was not there on June 4, 2003. That is my signature on the grievance form dated August 18, 2003. *See Plff's Ex.* 5 at p. 24.

If an inmate needed immediate medical attention, we would get the jail administrator or the sheriff. If immediate attention was not needed, we would give the inmate a medical request form. The inmate would fill it out and return it to us. We would give it to the jail administrator. If the administrator was not there, we would put it in his box.

The jailer just received the forms. We didn't do anything else with them. Butler did give me medical request forms.

If an inmate just had general aches and pains, we could provide them with over-the-counter medication. If it went beyond that, the inmate had to fill out a medical request form.

AO72A
(Rev. 8/82)

As a jailer, I was responsible for the general care of inmates. I made sure they were fed, provided medication, over-the-counter and prescription, provided water, and made sure the cells were clean.

We keep a log. The log is used to keep track of what we do in each of the pods. If we provide water, we write it in. If we give medication out, we write it in.

In 2003, at one time we had containers with lids that screwed on and off that we used to give the inmates water. When they needed water, we would fill the container. Other times in 2003, we did not have the containers and just had to provide water.

### Testimony of Robert Sivils

I'm an inmate in the Arkansas Department of Correction (ADC). I was in the ACJ on June 4, 2003. I had been there about two months when the June 4th incident occurred.

I recall being deprived of drinking water that day. We had been beating on the door asking jailer David Ferguson to bring us some water to drink. We had been beating all morning long. Ferguson said he would bring water when he got good and ready.

There was no running water in the cell. The shower was broken. When we showered we were taken to another pod. Usually we were allowed to shower every day. Sometimes every other day.

I think David Burton was on duty. At some point after that, he was charged with something to do with a death. He handcuffed someone to a bed and denied them water. There was a big investigation. I believe he was charged with cruelty to a human.

-9-

That day we had been provided with nothing to drink all day. The whole thing was because of drinking water. On a daily basis we didn't get water when we should have. We were always asking for water. The jugs would sit there getting hot. We would ask for cold water.

On June 4th, there was a period of four or five hours where we didn't get water. I woke up and there was no water. Usually we got water first thing in the morning.

There is no clock in the pod. You can't look out the window. You have to go by when they feed you. You wake up whenever.

Breakfast is usually served early between 5:00 and 7:00 a.m. I can't remember if we got any liquid with breakfast that day. I think we got water from the jug from the day before.

David Ferguson was on a power trip. He was a jailer. He had words with Shaw that day. Because of this, Ferguson didn't get us any water.

We blocked the camera to get them back there. Mike Vorhease told us to get the cover off.

They took our visitation and cigarettes away and shut our phone off because we wanted water. There was nothing left to do.

The officers were extremely wrong about that incident. We were wrong too. It is their job to look after us. We are their responsibility. We thought we were entitled to water. We simply wanted water. We were not asking for a fifth of whiskey or anything difficult.

It was seven or eight hours after I woke up that the deputies came in. No water had been brought in there that day.

I have no idea how water got on the floor of the pod. It might have been from a jug that sat there all night. We had a water jug that we used to wash our hands. We kept it all night to

-10-

wash our hands after urinating because there was no running water in the sink. You don't drink out of that jug.

They tried to set the trash can on fire. Then they got to thinking straight and tried to put it out. They used that jug to spray on the trash can. That is how water got on the floor.

We did flood out the pod. The toilet was repeatedly flushed. The inmates did this.

I recall the light being broken. Everything escalated and got out of control. The table was torn up. Adrenaline was pumping and it got out of hand.

The water in the shower didn't work on that day. It didn't work the whole time I was in there. The sink didn't work.

There was a window in the pod that looked outside but it had been painted over. There was also a plexiglass window in the door. We broke that window out. We all took a "lick" at it but Shaw got the final "lick."

At one time, we had some rods. Steel material we were using as noise makers more than anything else and to intimidate them. We were beating on the door. The rods were from a metal chair we had torn apart.

Culp came in the pod two or three times to get us to stop what we were doing. The first time he said he was going to take away our visitors. So why should we stop? Why not just go on?

Culp asked us to come out of the cell. Our heads were screwed up. We were sticking together. We thought we might get something accomplished. We thought they might treat people better down the road.

-11-

Another time two officers came in to subdue Ernie Thompson. Shaw and I grabbed the metal rods and the officers shot out of the pod.

I had met Frierson. He was on the City Police and had stopped me numerous times. I don't recall if he ever gave me a citation.

When the officers all came in, you could see in the cell. There were no lights on in the cell. The lights had been broken. But the door to the hallway was standing wide open and light was coming in from the hallway. The hallway is well lit. It is not a very big bull pen. It was day light. A little light was coming in from the window.

Culp was standing in the door. He had a maglight in his hand. He was asking us to come out.

Six, seven, or eight officers came in. There were a number of officers.

When they entered the officers had flashlights with them. I knew then that there was going to be trouble. We were all lined up against the back wall with the mattresses held up. We all screamed: "We don't want no fighting. We don't want no trouble."

We thought we were going to be maced and then it would be over with. We all had wet towels. We didn't figure we would be beat down. We had put the table in front of the door to keep them from rushing in. We wanted time to get prepared for the mace. At this point, we were pretty sure we were not going to get water. It was a rebellion for not getting water.

As soon as the officers entered, we all threw the rods on the table and backed up from them. They started telling us to drop the mattresses. To put the mattresses down. I knew something was going to go down. Frierson was the one that I first saw come in. He was the most violent of them all.

-12-

Frierson was beating Butler. I was right beside Butler. He was to my left. There might have been one other inmate between us.

I don't recall the officer's name but he came over and hit me one good time beside my head. I never saw this officer before. He had red hair and a mustache. He hit me with his maglight. I dropped the mattress, jumped down on the floor, and put my hands behind my back.

I laid flat on the ground and put my hands behind my back. I was not moving. I didn't want to get killed.

There was one big fight going on between inmate Ernie Thompson and Deputy Jamie Martin. The officer that had been on me turned to help Martin. There were about three officers trying to subdue Thompson. I wasn't a threat. I was lying on the floor on my belly with my hands behind my back.

Frierson was screaming at Butler to shut up. Butler was screaming and Frierson kept hitting Butler. Frierson hit Butler numerous times. I can't say a specific number of times. Butler was trying to block the blows with his hands and feet. He was on his back on the floor.

I was watching and thanking God it wasn't me. I was watching the entire time. I was in amazement it was really going down.

Finally, after Frierson got done beating Butler, I was just lying on the ground looking at Butler. Frierson took his flashlight, the butt of it, and hit me on the side of the head. Frierson said: "This is my f------ jail. This is my f------ jail." That was the main thing he was screaming.

I was being as still as I could. I was afraid if I moved I would get hit. I was guarding myself. I got hit one good time.

We are not crazy. We were not trying to attack them but then we ended up being attacked. Butler had nothing in his hand.

Dan Wiggins held my arm and was leading me out of the pod. When I came outside the pod door, Culp hit me in the back with his flashlight. He tapped me on the back. My hands were cuffed behind my back and I had straps on my ankles. Culp said to get on the floor.

Afterwards they took Butler to the hospital. He probably would have died if they hadn't taken him. He was walking around with blood pouring out. They took Ernie Thompson too.

I asked to go to the doctor. I was not taken. Instead, my feet and hands were bound and I was taken to the hole.

I had some blood on the side of my cheek. After I was transferred to the ADC, I went to the Diagnostic Unit. They put me in a neck brace and took pictures of the side of my face. I've been classified (M-2) as a result of the neck and shoulder injury I got that night.

Jacob Shaw, another inmate, and I were locked in the hole all night after the incident. We were unable to use the bathroom. We were pretty bloody. I don't recall if I talked to Butler after June 4th.

I was charged with obstructing government operations as a result of the incident. I pled guilty to get it over with. I did not come out of the bull pen when I was ordered. Under the circumstances, I might have beaten the charge.

There should be a tape of the incident. I'm not sure if the camera was recording or just monitoring. However, when I was a trustee for four months I had a conversation with Michelle, who was a dispatcher. She mentioned that they could record.

-14-

### *Testimony of Earnest Thompson*

I was in the ACJ on June 4, 2003. I remember a little bit about that day.

I'm on medication. I take mood stabilizers. I also go to counseling and therapy.

I got hurt and went to the hospital. Butler got hurt too. We both got hit.

I remember the whole thing was about water. When I woke up, I heard guys saying we hadn't had water yet. David hadn't brought any. Everyone was kind of hysterical. Normally, you asked for water, and a jailer would bring it. David had a problem with Shaw. David didn't bring us any water.

We were served breakfast that day. Usually we got water with breakfast. They usually brought jugs around.

I know it went on for several hours. Culp came and asked us to come out. We were trying to work the situation out. I was talking to Officer Guy and to Culp and trying to work it out. Something was said about visitation.

The guys got hysterical and rowdy. I was involved in a lot of things. One of the tables was ripped out of the floor. I might have been involved in that. I believe the camera was covered.

There was water on the floor. The toilet was repeatedly flushed in order to make it flood.

I don't remember all that much about when the officers came in that night. I know Butler was struck. He was bleeding pretty bad. He took twelve or fifteen "licks" to his head. I didn't see Frierson hit Butler.

I was on the far end, on the right, in the corner. We were all lined up against the wall. I can't recall exactly where Butler was.

-15-

I don't know what time the officers came in. Jamie Martin hit me. I was struck on my head close to my temple. When the officers came in, I think I had a stick or a pipe in my hand. It was a piece of chair. I also had a mattress in front of me.

There was a little bit of light in the pod. When I was taken to the hospital it was dark out.

I pled guilty to obstructing government operations. *Defts' Ex.* 22. I've had run-ins with law enforcement officers. I've been in trouble a few times.

### *Testimony of Sheriff James Robinson*

I've been the Sheriff of Ashley County for five years. I have pled guilty to a misdemeanor civil rights violation when I threatened an inmate. There was no physical altercation. I didn't use force. I made a threat.

On June 4, 2003, I received a phone call from Culp at home about 9:00 p.m. I may be wrong about the time but it was later in the evening.

He told me about the situation at the jail. He told me the inmates in BP3 had torn the table out, torn the lights out, and had pretty much destroyed the bull pen. He told me the efforts he had taken to control the situation. He said the inmates had refused to come out. Culp requested that I come to the jail.

The table was bolted into the concrete floor. We had never had one torn out before.

He told me that on two occasions he had gone to the door, opened it, and talked to them and tried to get them to come out. At the time, I don't think Culp mentioned potential weapons.

I just live a few minutes from the jail. I went to the jail.

I don't recall having an incident like this at the jail before. Culp and I talked again. I suggested he go to the door one more time and talk to them. He did that and came and said they

-16-

had weapons. He also said they had mattresses on the west end of the bull pen and they were behind the mattresses. He said they advised him they were not coming out and we would have to come in and get them.

I didn't know the camera was covered up at that time. Culp told me the floor was covered in water. At that time, I didn't know the inmates were upset about not having water.

We talked and came to the conclusion there was only one thing we could do. Go into the bull pen and bring them out. We only had one jailer and a female dispatcher working at the jail. There were eight people in the pod.

I got on the phone and called Frierson at home. I also called five or six of my people and one other Hamburg police officer. I felt like it was a serious situation. It could have been a potential life or death situation. It took them twenty to twenty-five minutes to get there.

I told them the situation in the cell. I told them the floor was wet, the lights had been torn out of the ceiling, the table was torn out of the floor and partially blocking the door. I also told them I wanted them to go in and bring the inmates out of the bull pen.

The officers had no weapons. It is not a good policy to have a weapon in a secure area. They did not have mace. If I would have told them to go in with mace, they would have gone in with it.

I felt like it might be difficult to get the inmates out. My first concern was the safety of the officers. My second concern was the safety of the inmates. I told the officers not to get hurt and don't hurt anyone.

AO72A
(Rev. 8/82)

The bull pen had one window to the outside of the jail. It was painted over outside. It had some kind of protection on the inside so it couldn't get broken. There was also one small window in the door. It was dark in there. The officers carried flashlights.

I went back there but did not go in the bull pen. There were a lot of things said from both sides when the officers entered. I can't say what was said by anyone. A lot was going on in a very short time–half a minute.

After the officers went in, it was less than a minute and things were under control. The inmates were all brought out. A deputy was injured. I took the deputy to the hospital. I had a patrol officer take two inmates who were injured to the hospital.

All the inmates were placed somewhere else in the jail. The water had been in the hallway. I believe we had cleaned a lot of it up from the hallway. The hallway was still wet but not like the pod itself.

I make policy within the Sheriff's Office. Prior to June 4, 2003, we gave the inmates water every hour. It was documented. If a request was made before the hour was up, they were given water. The inmates were given cold water not warm tap water.

We thought we were doing the best we could but we weren't so we changed the policy. We are operating an antique jail. Within a few days of the incident, we put upright Igloo coolers in each pod. Each morning the coolers were filled up with ice and water and each and put in each pod as a separate source of water.

Inmates receive water or liquid with each meal. I was not the officer on duty on June 4, 2003.

-18-

We had a policy in place regarding medical requests in 2003. *Cty. Defts' Ex.* 1. We observe the inmates regularly. The jailers are constantly in and out of the secured area.

Inmates fill out medical request forms. The forms are given to the jailer. The jailer takes the form to the jail administrator. We do not have a jail nurse or doctor. The decision is made by the jail administrator whether the inmate needs to go to the doctor. The jail administrator makes the decision based partly on observations made by the jailers. In some cases I'm consulted. We may even talk to the family. When an inmate enters the jail, we get updated medical information from him.

We don't determine how sick an inmate is. We don't determine treatment. We do determine if the inmate has to go to the doctor.

I've seen some medical reports about Butler since June 4th but at the time I didn't know anything was going on with his medical condition. I do recall having a conversation with his Mother. I don't recall if it was on a visitation day I saw her. She threatened me with a lawsuit. She thought we were no good. I don't recall anything about Butler's physical condition.

I don't remember any problem with Butler's medical needs after he was taken to the hospital. I was aware of the fact that staples were put in his head. I don't know when they were removed.

I think we had an appointment to have them removed on a Thursday. The nurse called and said the doctor had to go out of town and to bring Butler in on Monday instead. I asked if he would be okay and she said he would. So we didn't try to take him to another facility. I don't know the dates when this happened. I can't explain why it was so long before his staples were removed.

-19-

*Testimony of Jim Culp*

I'm employed as an investigator with the Ashley County Sheriff's Department. In 2003 I was investigating crimes and sharing the responsibilities of jail administrator with Chief Deputy Marilyn Smith.

Butler was booked into the ACJ on May 16, 2003. *Deft's Ex.* 1. When an inmate is booked into the ACJ, a medical questionnaire is completed. *Defts' Ex.* 1 at p. 2. It is standard procedure to do a medical history on each inmate.

When I receive a medical request, I speak with the jailer about what he is observing in the jail. I make a determination as to what I feel is best at the time. The jailers judge by the inmate's activities in the cell. If they observed Butler having problems, that is one thing. If they observed Butler interacting with others, slamming dominos down on the table, then I don't feel that is life threatening at that point. I was told this was the situation with Butler by more than one jailer.

Butler sent in a lot of requests but I never saw any that talked about Mr. Frierson.

I bought pink paint for the jail. It was a calming color. It was left on for three weeks or more and then I was advised to repaint it.

I know how water was going into the cell everyday both before and after the incident. I never received word that Butler wanted to talk.

I got to the Sheriff's Office between 8:00 and 8:30 p.m. on June 4, 2003. The first time I went back to the bull pen it was about 8:30 p.m.

I had a jailer open the door. There was water on the floor. I gave each of the inmates an opportunity to come out and tell me what was going on. They were mouthing off but no one

-20-

would come out and talk to me. No one would tell me what was wrong so we could get the problem resolved.

I made another trip back there in about fifteen or twenty minutes. I had a jailer open the door. I almost begged the inmates to come out and tell me what was going on so I could correct whatever problem was going on. No one would come out and talk to me.

The third time I went back there the floor had been flooded. The lights had been knocked out. I believe Deputy Hughes told me there were some chair pieces in there. This time Mr. Thompson walked half way from the back wall to the door and indicated he was coming out to talk to us. Then he turned and went back to the wall. I don't know what happened.

I called the sheriff after I went back the second or third time. As I was briefing him, you could hear banging going on. The inmates were moving the heavy table around. The Sheriff contacted the other officers for assistance.

The fourth time I went back the inmates were holding pieces of the chair. All four times I went in the inmates were all lined up against farthest wall to the right or the west wall--the back wall. *Deft's Ex.* 12.

Then Sheriff Robinson came and gave us the order to go in and bring out the inmates. We were not to use more force than necessary to subdue and remove the inmates from the cell.

It was close to 10:00 p.m. when the officers went in. I went in when the officers did. The only light was from the flashlights we were carrying. There was both water and oil on the floor.

The time from when we entered the room until the inmates were subdued was only a matter of seconds. The Sheriff took care of getting the two inmates to the hospital and took Deputy Martin to the hospital.

-21-

No one said water was an issue until after the incident.  It was sometime after the inmates were brought out.  The inmates were sitting on the concrete outside the cell.  My understanding was the problem was the inmates covering the camera.  They had done this a couple of days before.

At that time, I had advised David Ferguson to tell them to keep it uncovered.  They were told if they covered it again they would lose their visitation for two weeks and possibly the phone.  I never once told the people in the cell their visitation or phone was canceled like there was testimony to today.

The day after the incident, I wrote my report and gave it to the prosecutor.  He charged each inmate in the cell.  I don't recall getting any grievances about the incident.

I have seen some of the grievances Butler talked about.  Grievances are received by the jailer and put in the basket for myself or Marilyn Smith.

No weapons are allowed in the jail.  All weapons are checked in the foyer.

There was a camera in the pod.  It goes to a monitor in the radio room.  It does not have a recording device.  We could not use it to monitor what was going on that night because it was covered up.

The bull pen had running water in the shower and commode.  Drinking water was kept in the freezer in the kitchen.  It was brought around every hour.  If it was requested before the hour was up, it was brought before that.  If the officers were booking someone in, it might vary five or ten minutes.

AO72A
(Rev. 8/82)

There was a problem with the shower valve for awhile. It was fixed. I don't know the exact dates. However, that night both the commode and the shower were used to flood the bull pen.

We comply with the fire code and have an evacuation schematic. If a toilet backs up or floods, we take care of it as quickly as possible. If a plumber is needed, one is called and we get it cleaned up.

June 4, 2003, was the first time we had problems like this at the ACJ. The daily shift notes show what was going on during each shift. *Cty. Defts' Ex.* 2. They show what jailers issue or do regarding the inmates.

When Adrian Cobb bonded out of the jail, he told a jailer he wanted to talk to me about the June 4, 2003. incident. Since he had been in the cell, I advised him of his rights and he signed a waiver of rights.[3]

### *Testimony of Calvin Frierson*

I'm a police officer with the City of Hamburg Police Department. I've received training in a number of aspects of police work. *Deft's Ex.* 30 (training up to 6/4/2003).

On June 4, 2003, I was at home when I received a call from Sheriff Robinson at 9:04 p.m. He asked me to come to the jail because of a problem they were having with inmates. He stated the inmates had taken over the cell and flooded the jail.

I got dressed and went to the Sheriff's Department. I live three or three and a half blocks from the jail. I didn't take a weapon or mace with me.

---

[3]The undersigned ruled that this testimony was inadmissible. Defendants were allowed to make an offer of proof. In addition to having Culp testify about what Cobb told him. Defendants proffered exhibits 3 and 4. Exhibit three is the waiver of rights form and exhibit four is a statement purportedly written by Cobb on August 29, 2003.

AO72A
(Rev. 8/82)

When I got there I noticed there were a number of officers present. The Sheriff began briefing us on what was going on. I observed the floor was completely wet. There was extremely loud banging going on. We got instructions from the Sheriff.

Robinson and Culp explained that the inmates had flooded the jail. There was no question of that. The moment we walked into the booking room there was a large amount of water. I was told to be careful and to watch for weapons. The inmates could possibly be armed. It has been my experience as a law enforcement officer that in situations like this inmates can become very creative. They can make weapons out of pretty much anything. I've seen weapons made out of toothbrushes.

Sheriff Robinson advised us to be careful. We had more than one goal–to accomplish the task at hand and successfully remove the inmates and to come out unhurt.

I was not even told about the chair until after I entered the cell. I did see an orange uniform floating in the water in the hallway. As we entered the cell, the floor was very slippery. There was an over abundance of lotion or baby oil. We were holding onto each other to keep from falling down.

The jail is underground. It was dark outside. There is one window in the cell but it is "blacked out." There was no light in the cell. We used flashlights to illuminate our entry. This was the only light other than some coming from the hallway.

I only entered the cell once. I was the second one in the cell. Officer Lee Nimmer and I removed the large steel table. We moved it out of the way and went into the cell. *See Deft's Ex.* 13 (door is to the north of the table–table was up against the door).

I went in behind Nimmer. I was holding onto Nimmer. I had my hand on the back of his left shoulder and my flashlight pointing over his right shoulder. As we got in the cell, I went to the left and he went to the right.

Nimmer and I had slowed down to let the other officers catch up. The other officers came in single file. The west wall was lined with inmates. Some inmates were only in boxers and flip-flops , some had on orange jail pants, some were topless, or just wore t-shirts.

As we went in, I was the lead officer. The inmates had mats from their beds and were holding them up. As we approached them, I began telling them to drop the mats. I told them they were going to catch a charge over something stupid. I had heard it was all over water. There was complete silence in there. I was talking. The inmates were not talking. The other officers were not talking. It took about thirty or forty-five seconds to get to where the inmates were.

The inmates continued to hold the mats up and not say anything. I went forward slowly until I got within arms reach of the first white inmate. I believe this inmate was directly in front of Nimmer. I can't recall the inmate's name; it may have been Sivils. I took my maglight flashlight and put it across the inmate's arms at a forty-five degree angle to stop him from sucker punching me so to speak. I snatched the mattress down.

I heard a loud smack. I looked to my left. I saw Deputy Martin with his hand on his arm and blood running down his arm.

All chaos broke loose. Water was splashing on me. I saw fists flying. I heard feet flying. I heard a whole bunch of profanity. In an effort to get away from there, I was swinging my

AO72A
(Rev. 8/82)

flashlight getting ready to strike something or someone but the flashlight was struck from my hand.

There is no question. I did not strike anyone. The white inmate in front of Nimmer went to the ground and Nimmer put plastic tie cuffs on him. We began dragging him out. From the time I removed the mattress until the actual encounter was over it was probably only ten or fifteen seconds total, if that long.

The inmates were cuffed and put in plastic restraints. When all inmates were out, we went to the booking area.

Some officers went back to the hall. There was blood in the water. The Sheriff thanked the officers who were not with Ashley County. I left and went home.

Today is the first time I remember seeing Butler. If I saw him in the cell, I don't remember him.

I don't work for the Ashley County Sheriff's Department. The only inmates I'm familiar with, or typically have contact with, are the trustees who are used to wash our cars. My department is across the street from the Sheriff's Department. We also have our inmates over there. There is a board with small pictures of the inmates on it. Sometimes I scan the board. As far as I recall, this is the first time I've seen Robert Butler.

I heard Sivils testify that I struck Butler. I have no idea why he would speak on Butler's behalf. However, I do know Sivils. I have been arresting him for years.

I went back to the bull pen to take pictures and get an idea of its approximate size. I wear size thirteen shoes. It took thirteen steps north to south and twenty-five steps east to west. From where we entered that evening, it took twenty-three steps to where the inmates were.

-26-

Defendant's exhibit 13 is a picture of bull pen 3. It is also referred to as a pod. This is the cell in question.

Defendant's exhibit 14 is a picture of the ceiling and the back glass or window. Above that was the light fixture that was busted out. There was another fixture busted out.

Defendant's exhibit 15 is a picture of a light fixture with a mesh metal protective cover. On the night in question this was also broken.

Defendant's exhibit 17 is a picture of the entrance door to BP3. It depicts the panel that was protecting the glass.

Defendant's exhibit 19 is a picture of the monitors in the radio room. There are five monitors that go to the separate bull pens. They provide a visual. When the cameras are covered, the monitors are blank.

Defendant's exhibit 11 is a picture of the broken pieces of the metal folding chairs. The legs were taken out. The chair was taken out of the bull pen that night. The round circular item is a light fixture that is extremely sharp. The picture also shows the seat and back of the metal chair.

The maglight I used that night belongs to the city and is assigned to patrol unit one. I took it into the pod. I used it to illuminate–to see what was going on. It is 11 3/4 inches long, 2 inches wide at the base of the light, and 1 3/4 inches across at the bottom.

### *Testimony of Robert Butler*

I am currently serving a sentence at the Forcht Wade Correctional Center. On June 4, 2003, I was in the ACJ. I was awaiting trial on pending charges.

-27-

I was picked up and put in the ACJ on May 16, 2003. I didn't complete an inmate medical history when I was booked in. That is not my signature. *Deft's Ex.* 1 at p. 2. The booking records do contain my name and social security number. I didn't say I had a history of headaches. I wasn't asked about my medical history.

For the first few days every thing was going okay. We were getting water like we were supposed to.

On the day of the incident, David the jailer came on and we asked for water. I don't know what his situation was. I slept most of the day.

A jailer came back and told us David had gone home. On the same night we asked for water. No way will the report show that we had anything that day.

I knew Culp asked inmates to come out. I didn't go out. I don't know if Culp came in several times or not. In my opinion if I had gone out I wouldn't be sitting here today.

If you get hit in the head, you can't remember nothing. I can't remember nothing. All I remember was getting beat. Certain things you remember and certain things you don't.

When Frierson came through the door, all the other inmates were pretty well already handcuffed. It was just about at an end.

He ran over when another man was cuffing me and started hitting me in the head. I had been standing up behind a mattress. We were all lined up behind the mattresses. The officers came in with flashlights and mace in their hands. We were not sprayed with mace. The officers said to get down. I was lying on the floor prior to Frierson hitting me. A white officer handcuffed me and then stood me back up and was putting rope around my legs.

-28-

This is when Frierson hit me. He hit me eight times. I moved to try to stop the blows. I put my hands up over my head. It lasted until I hit the floor. I got both my fingers broken in the process of trying to block the blows. I never did report that. I thought they were just swollen up. Sheriff Robinson and Jim Culp gave Frierson permission to beat me.

As a result of the beating I received, I had four or five cuts and eight staples were put in my head. I was hit in the head eight times. I was seen in the emergency room for the contusions.

I was seen by Dr. Henry twice. I was having some memory problems. The first time, Dr. Henry recommended that I be taken off all medication for a few days.

The second time, I was still having trouble and he prescribed medication. He said if I was still having headaches and trouble sleeping he would consider a neurological referral but then I got transferred to the ADC.

At Wrightsville I had a neurological examination. They said the headaches were unknown. The doctor said they could have been caused by any of the injuries. He said you just don't know where headaches come from.

The MRI came back negative but I didn't agree with it. You can have a normal MRI and still have problems.

I still have bleeding from my nose and between my legs. The bleeding from between my legs first occurred four or five months after the June incident. This problem has been checked out by the nurse but I haven't been seen by a specialist.

I take six pills a day for headaches I can't get rid of. It has left me with nightmares and lots of medical problems. I never had high blood pressure before. I never needed glasses before. None of this happened until I got hit in my head.

-29-

I didn't say anything to the doctor about my hand.  I don't think they x-rayed my hand.

I got dents in my head.  No way will you see on the report that I was involved in anything.  Culp didn't come back and investigate.  I didn't put my hand on anything in that cell.  I can't be responsible for what others did.

My living conditions claim is based on the denial of drinking water.  When it rained, the jail flooded.  There would be mold on the walls.

My medical treatment claim is based on the fact that I had to wait fifty eight days from the time I first put in a medical request before I went to a doctor.  I suffered.  The doctor prescribed some pills.  When I went to the penitentiary I had even more problems.  My nose would just start running blood when I was talking to people.  I was bleeding between my legs.  My eyes were changing.  I did have 20/30 vision and now I have 50/70 vision.

I was hurt in my head like a man swinging a bat trying to hit a homer.  That is how hard I was hit in my head.

I didn't have a history of headaches prior to the June 4, 2003, incident.  In part because of a car accident I was in, I had headaches off and on but never had headaches like I do now.  The accident was in 1989 or 1990.

I wasn't hurt in the car accident.  I had also been hit in the head with a high heel shoe, not a pipe, in 1989 or 1990.  It was fifteen or sixteen years ago when a guy hit me.  If you have been hit in the head you can't remember that good.  I don't remember.  I can't remember nothing if you want the truth.

I remember getting hurt when I fell in the shower in 1988.  Although the reports say I was complaining of a neck and head injury, I was complaining about my back not my head.

-30-

I was diagnosed with high blood pressure in the ADC in 2004. This didn't happen until after I had been hit in the head. I didn't have high blood pressure back in 1990 or 1991.

I can't remember being treated at Conway Memorial Hospital in Louisiana in September of 1988. I believe I was injured in August of 1991 but I've never been treated for a head injury.

I'm taking medication for my head. I found out a week ago I have cancer. The cancer had nothing to do with the incident of June 3, 2004.

When the head is damaged, your whole body is damaged. This is the reason I have glasses now. I've never been told the reason I need glasses is because of the June 4th injury. Fifteen or twenty years ago I was treated as a result of a knot on the side of my head.

I can't remember how many lawsuits I've filed. Like I said at times I pretty much can't remember my name. I have filed lawsuits though.

I filed my own complaint in this case. I didn't ask anyone to look over the complaint.

I guess my brother-in-law is Franklin. I just met him. I didn't meet him at Wrightville. I don't recall telling him I didn't know who hit me.

If there is trouble in Hamburg you were going to find out where it was. There were three names you heard Frierson, Culp, and Robinson. Culp was the arresting officer. I didn't know Frierson until he hit me. I know he hit me on the head. I told the people in Morehouse Parish Jail and my family about the amount of force Frierson used. I didn't talk to the Chief of Police and the Hamburg Police Department.

I gave a grievance form to John Liles to give to Frierson. Liles said it wasn't his signature on the statement but he never said I didn't give him a grievance form or that it wasn't

-31-

his signature.  I never got a copy of the grievance.  Liles never gave me a copy.  I was told Culp was not going to make any more copies.  I gave the grievance to Liles on July 31, 2003.

I pled guilty to charges arising out of the incident on June 4, 2003.  *Deft's Ex.* 22.  They wouldn't let me plead on some other charges I had unless I pled to all the charges.  I was guilty of not coming out of my cell.

If I had to go back to the ACJ, I would do the same thing.  I wouldn't come out.  You just don't know how it looked.  They put me in a cell with no water.  If there had been water, nothing would have happened.  I had problems before the incident but nothing like now.  I'm living on medication.  I'm taking six pills a day.

### Butler's Medical Records

Butler was seen at the Ashley County Medical Center emergency room on June 3, 2003.  *Plff's Ex.* 3.  He was admitted at 11:38 p.m.  *Id.* at p. 3.  Butler had a 1.5 cm. laceration to the right side of his forehead, a 4 cm laceration to the top of his head, and a 3 cm laceration to the top right side of his head.  *Id.* at p. 7.  He had minimal bleeding.  *Id.*  He reported to emergency room personnel that he had been hit with a flashlight.  *Id.*

His hair was trimmed and shaved around the lacerations.  *Plff's Ex.* 2 at p. 4.  The lacerations were cleaned, perma-bond applied to the laceration on his forehead and staples placed in the laceration on top of his head.  *Id.*

An x-ray of Butler's skull was normal.  *Plff's Ex.* 2 at p. 10.  An x-ray of his right wrist was normal.  *Id.*  The discharge instructions indicated the staples should be removed in five to sever days.  *Id.* at p. 4.  Butler's staples were removed on June 25, 2003.  *Plff's Ex.* 6 at p. 122.

Butler's intake physical at the ADC indicates Butler reported a head injury in June and stated he was told he had post concussion syndrome. *Plff's Ex.* 2 at p. 1. On October 3, 2003, Butler put in a health service request form. He stated he was having problems with his left ankle. He also indicated he was suffering from a head injury he sustained in the ACJ and was having bad headaches. He stated he was beaten in June of 2003 and having blurred vision and forgetfulness. He also indicated his right wrist was broken at the jail. *Id.* at p. 4.

On February 4, 2004, note is made that an MRI of Butler's brain was negative. *Plff's Ex.* 2 at p. 6. On February 16, 2004, a diagnoses of cephalgia (headache) of unknown origin was made. *Id.* at p. 5.

Butler's records from the Forcht Wade Correctional Center in Keithville, Louisiana, indicate he continued to complain of headaches. *See e.g., Plff's Ex.* 4 at p. 5 (complaints of Cephalgia secondary to trauma to the head). Butler also complained of profuse nose bleeds in May of 2005. *Id.* at . 45. Butler was on blood pressure medication. *See e.g., id.* at p. 46.

Butler's records from the Morehouse Parish Detention Center in Collinston, Louisiana, indicate that in 1988 he fell in the shower and complained of head and low back pain. *Plff's Ex.* 6 at p. 62.[4] The records from the E.A. Conway Memorial Hospital where Butler was seen following his fall indicate Butler reported being on blood pressure medication. *Id.* at p. 70.

When he was booked into the jail in June of 1990, note was made of the fact that Butler was taking medication for headaches and back pain from a motor vehicle accident that occurred in November of 1989. *Id.* at 63. It was also indicated that Butler had high blood pressure. *Id.*

---

[4] Butler objects to the court's consideration of these old records. *See* Doc. 63 filed August 16, 2005.

AO 72A
(Rev. 8/82)

In May of 1991 he continued to complain of headaches. *Id.* at 62. In June of 1991 he complained of headache, lower back pain, and "even of high blood pressure." *Id.* Note was made of the fact that he was not hypertensive at that time. *Id.*

In August of 1991, Butler complained of having severe headaches every day since he had been in an automobile accident in 1989. *Plff's Ex.* 6 at p. 79. He also complained he had hurt his back in the same accident and it was tight and aching. *Id.*

In September of 1991, he complained of high blood pressure. *Plff's Ex.* 6 at p. 81. When he was incarcerated in October of 2002, he stated he did not have high blood pressure. *Plff's Ex.* 6 at p. 53.

The records from 2004 and 2005 indicate he reported a history of headaches and problems with his vision since the incident in June of 2003. *See e.g., Plff's Ex.* 6 at p. 5 & p. 8. He was prescribed glasses in March of 2005. *Id.* at pps. 7-8. *See also id.* at pps. 10 (need treatment for my eyes and EEG and CT scan of my head–dated 3/16/05); 13 (still having headaches–dated 4/19/05); and 15 (still having headaches–dated 5/3/05);

Butler complained of his nose bleeding and bleeding in his penis area. *Plff's Ex.* 6 at p. 19. He stated this hadn't started happening until be was beaten by the Ashley County Sheriff's Department and the Hamburg Police Department. *Id.* at p. 19 (dated 8/22/04). *See also id.*, at pps. 10 (lose blood between my legs-dated 3/16/05); 13 (still coming from between my legs–dated 4/19/05); 14 (blood still coming from my nose–dated 4/26/05); and 15 (at random times having a lose of blood between my legs and nose–dated 5/3/05).

**Testimony of Lee Nimmer**

-34-

I'm an officer with the Hamburg Police Department. On June 4, 2003, I was called by Frierson and told he had been called by Sheriff Robinson. Robinson said he needed officers to come and help out with a problem he had at the jail.

When I got to the jail, I was told what the conditions were and what the incident was about. I was told the inmates had weapons and the floor might be flooded and slippery. We were told to go get them out and be sure to be safe and don't get hurt ourselves. Frierson and others were present.

Frierson and I moved the table away from the door so the rest could get in the door. There was no light in the pod. I didn't have a flashlight but Frierson did. Some of the others also had flashlights.

I was the first officer. Frierson was behind me. Breedlove was to my left.

It took fifteen to twenty seconds to get to the inmates. Frierson was talking to the inmates. He was telling them to drop the mattresses and weapons they had in their hands.

No inmates came forward. We moved forward slowly. We didn't want to slip. Frierson was to my left behind me. He was shining his light over my shoulder. When we got within arms reach of the inmates, Frierson reached and grabbed a mattress.

Then I heard a "lick" pass and blows. There were blows being thrown at each other. One guy at my right swiped at me and he went down on his knees and threw both hands up.

I looked past him and saw one of the deputies had been hit. Frierson was in front of me then. He was using his flashlight to block. I didn't see who he was blocking. As he was using the flashlight, it dropped from his hand.

-35-

The time between when Frierson reached for the mattress and when all the inmates were subdued was probably only fifteen to twenty seconds. I didn't see Frierson strike anyone. I didn't receive any blows.

### Tommy Breedlove

I'm the Chief of Police of the Hamburg Police Department. I've had the position for nine years.

Frierson has the training required to be an officer. You must attend training within the first year of being hired as an officer. There is no policy that allows the use of excessive force.

I never received a complaint about Frierson's conduct on June 4, 2003. The first time I was aware of Butler's claims was when the U.S. Marshal served Frierson.

### Frankie Bunton

I know Butler. He is my brother-in-law.

I was in the ACJ in 2003. Butler was shipped away before I was. He was in Wrightsville when I got there.

We were in Wrightsville together in 2003. He talked about the lawsuit and let me read it. He wasn't sure about all the names.

He wasn't sure who had hit him. He had to re-write the lawsuit three or four times.

He was asking me for officers' names. Especially, the names of the black officers.

He said he was going to get someone busted for beating his head. He wasn't sure of the names. As a matter of fact, he didn't know Nimmer's or Frierson's names. I knew Calvin but didn't know his last name.

-36-

Butler just said a big black officer. He didn't know the name. I told him he was probably going to need to look at pictures.

He told me he wasn't sure of who he was going to say hit him. I don't know anything about Butler having headaches before June 4, 2003.

## II. DISCUSSION

As noted above, Butler has asserted the following three claims: (1) excessive force was used against him by Calvin Frierson during the June 4, 2003, incident; (2) he was denied adequate medical care; and (3) he was subjected to unconstitutional conditions of confinement.

### *Use of Excessive Physical Force*

Defendant Frierson contends this case must be dismissed because Butler did not submit a grievance at the ACJ or a complaint to the police department about Frierson's conduct. As amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001). Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002). Specifically, it has been held that

-37-

a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a). *Conception*, 306 F.3d at 1352. When all claims have not been exhausted, the case is subject to dismissal. *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

In this case, Butler testified he gave a grievance to Liles on July 31, 2003. No copy of the grievance has been produced. Neither Liles or anyone else who testified recalled seeing the grievance. The only grievance submitted as evidence that contains any mention of Frierson is one dated August 18, 2003. *Plff's Ex.* 5 at p. 24. On that form it states "Jim Culp told the jailer to remind me of what Calvin did. It might happen again." Former jailer Timothy Brad McGhee testified it was his signature on this form.

Given the testimony, the court has serious doubts that Butler exhausted his administrative remedies with respect to his claim against Frierson. Nevertheless, we decline to dismiss the case on this basis. While there was testimony regarding the manner in which medical requests and grievances were handled as well as whether inmates were given copies of the requests, it was less than clear whether inmates always received copies of the documents they submitted.

Additionally, Culp testified he was sharing the duties of jail administrator with Marilyn Smith at the time. Her testimony was not offered. Culp did not recall seeing all the grievances that were submitted by Butler as evidence. For instance, Culp could not recall having seen the August 18, 2003, grievance mentioned above. While it does appear that either Frierson or Captain Breedlove saw such a grievance and we have serious doubts such a grievance was submitted, we will nevertheless turn to an examination of the merits of Butler's excessive force claim.

-38-

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Butler testified he was in the ACJ on pending criminal charges. Typically, "[p]re-trial detainees are those individuals who the government has probable cause to believe have committed crimes. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 863, 43 L. Ed. 2d 54 (1975). They are confined pending trial, either because there is cause to believe that they are dangerous or because they cannot afford to make bail." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

Despite these distinctions, the courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir.

-39-

2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Butler maintains that he was struck repeatedly in the head by Frierson while he was handcuffed. Butler maintains he went down to the floor and attempted to shield his head and face from the blows with his hands.

Butler's testimony regarding the force used by Frierson is supported by the testimony of Robert Sivils. Sivils testified he witnessed Frierson beating Butler and that Frierson also hit him in the side of the head with the butt of his flashlight.

We find Butler's and Sivils' testimony not credible. First, although Butler submitted numerous grievances and requests for medical treatment while incarcerated at the ACJ, he maintains he only submitted a single grievance about the alleged use of excessive physical force by Frierson on June 3, 2004. Given the sheer number of grievances and requests Butler submitted on a number of topics, the court finds it difficult to believe he did not mention, particularly in the requests for medical treatment, a beating as severe as he says occurred. This is particularly true when he contends he suffered severe headaches and other problems as a result of the beating.

AO72A
(Rev. 8/82)

The grievances contained in the record include complaints about the daily living conditions, *see e.g., plff's ex.* 5 at p. 4, migraine headaches, nightsweats and insomnia, *see e.g., plff's ex.* 5 at p. 7, water, *plff's ex.* 5 at p. 11, and not getting hot compresses, *plff's ex.* 5 at p. 17. He also submitted multiple requests for medical treatment. *See Plff's Ex.* 5. Not a single one of the grievances or requests dated after June 4, 2003, mention a beating or excessive force used by Calvin Frierson.

The only documents contained in this exhibit that mention the incident on June 4, 2003, or any beatings, brutality, or use of excessive force are not grievance or medical request forms. *Plff's Ex.* 5 at pps. 20, 22, and 23. Instead, the documents are printed by Butler on lined paper and purportedly signed for by John Liles. *Id.* Liles, however, testified that it was not his signature or initials on these documents.

Second, Butler testified the blows by Frierson were so forceful that two of Butler's fingers were busted while he attempted to shield his face and head. Butler was taken to the hospital shortly after all inmates were secured. He was examined, the lacerations treated, and x-rays taken of his skull and wrist. Butler maintains he did not mention his fingers to medical personnel because he thought they were just swollen. The court finds this testimony not credible. Moreover, we note that while voluminous medical records were introduced by Butler none establish that two of his fingers were broken on June 4, 2003, or at any other time. There is no indication in the records that Butler ever complained about his pain or swelling in his fingers.

Third, Sivils testified that Frierson repeatedly referred to the jail as being his jail. Given the fact that Frierson is employed by the City of Hamburg Police Department and the jail is run and maintained by Ashley County and/or Sheriff Robinson, this testimony makes little sense.

-41-

Fourth, Butler's testimony that Frierson entered the bull pen when the encounter was almost over is simply against the weight of the testimony. According to Butler, Frierson did not enter the bull pen until all the other inmates were pretty well handcuffed and the incident essentially was over. This testimony not only conflicts with that offered by Frierson and Nimmer but also conflicts with that of Sivils.

Butler did suffer injuries on June 4, 2003. As was mentioned in the emergency room records, he had three lacerations one of which required staples. The mere fact of the injury, however, does not suggest the injuries resulted from the use of force by Frierson. The injuries could have occurred in any number of ways.

While the injuries could have resulted from a confrontation between Butler and Frierson or Butler and some other officer, they could also have resulted from Butler's own actions. It is undisputed that Butler and the other inmates refused all Culp's requests that they leave the cell. The evidence establishes the inmates were lined up against the wall of their darkened cell holding mattresses in front of themselves and weapons made from the legs of a metal folding chair. Thus, some use of force was reasonable. *Cf. Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990)(When an arrestee flees or resists, some use of force by the police is reasonable). The evidence, however, falls far short of establishing that Butler's injuries were inflicted by Frierson or that he used excessive force against Butler.

### Denial of Medical Care

As noted above, Butler was a pretrial detainee during his incarceration at the ACJ. Thus, his claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "The

-42-

standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

-43-

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Butler submitted the following grievances/requests for treatment: not getting hot compresses for my head and neck–6/29/03; migraine headaches, stiffness of neck–7/8/03; head fractures, the doctor told me to come back in five days to put the other staples in my head–6/9/03; bad neck and head pain–7/15/03; migraine headaches and stiffness of the neck–8/16/03; migraine headaches, stiffness of the neck–7/20/03; bad pain, migraine, stiffness of neck–7/22/03; migraine

AO72A
(Rev. 8/82)

headaches, stiff and sore neck–7/23/03; migraine headaches, night sweats, insomnia–7/23/03;

severe migraine headaches, night sweats and insomnia due to nightmares–7/23/03; neck and head

pain–7/28/03; severe head pain, stiff and sore neck, and back pain–7/31/03; back pains, headaches,

and night sweats–8/3/03; chest pain, back pain, and neck pain–8/5/03; head pain, neck pain, and

back pain–8/13/03; and severe headaches and neck bothering me–8/17/03. *Plff's Ex.* 5

The daily shift notes indicated Butler was provided with a variety of over-the-counter

medication including Tylenol, "nasals," Pepto Bismal, sinus tablets, Ibuprofen, Nite Time Caps,

Day Time Caps, and Pink Bismuth. *See Cty. Defts' Ex.* 2 (daily shift notes covering May 5, 2003

to October 25, 2003). The undisputed evidence establishes that Butler was sent to the hospital

for treatment and x-rays right after the incident on June 4, 2003. The x-rays were normal and

his lacerations were treated. He had his staples removed on June 25, 2003. He was seen by Dr.

Henry on August 26, 2003, and September 8, 2003.

Culp testified he evaluated each of Butler's requests for medical treatment in part by

obtaining observations from several of the jailers. Culp indicated he relies on observations made

by jailers and their observations were that Butler was manifesting no serious medical problems.

Butler was observed going about the activities of daily living including playing dominos and

interacting with others.

There is no indication that Culp ignored an acute or escalating situation or that delays

in Butler being taken to the doctor adversely affected his prognosis. *Dulany v. Carnahan*, 132

F.3d 1234, 1243 (8th Cir. 1997)("The objective portion of the deliberate indifference standard

requires a showing of "verifying medical evidence" that the defendants ignored an acute or

AO72A
(Rev. 8/82)

escalating situation or that delays adversely affected the prognosis given the type of injury in this case."). We conclude Butler has failed to establish that Culp exhibited deliberate indifference to Butler's serious medical needs.

No testimony indicates Sheriff Robinson was directly involved in evaluating requests for medical treatment. To the extent Butler seeks to hold Sheriff Robinson liable because he failed to exercise supervision and control over the jail staff, Butler's claim fails. Sheriff Robinson can be individually held liable "only if he 'directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'" *Audio Odyssey, Ltd. v. Brenton First Nat'l. Bank*, 245 F.3d 721, 742 (8th Cir. 2001)(*quoting Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997)). "To be individually liable for failing to train his subordinates, Sheriff [Robinson] must have 'received notice of a pattern of unconstitutional acts committed by subordinates . . ., demonstrated deliberate indifference to or tacit authorization of the offensive acts . . ., [and] failed to take sufficient remedial action' --and the failure must have proximately caused [the plaintiff's] injury." *Audio Odyssey*, 245 F.3d at 742 (*quoting Otey*, 121 F.3d at 1155). *See also Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993). Here, "there is no showing of previous illegalities that place Sheriff [Robinson] on the requisite notice." *Audio*, 245 F.3d at 742. Thus, any supervisory liability claim therefore fails.

While a claim against Sheriff Robinson in his official capacity is the equivalent of a claim against Ashley County, *see Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 905 (8th Cir. 1999), "a local government may not be sued under § 1983 for injury inflicted solely by its employees or agents." *Bechtel v. City of Belton, Missouri*, 250 F.3d 1157, 1160 (8th Cir. 2001).

-46-

Instead, Sheriff Robinson can be held liable in his official capacity only if there is evidence of a custom or policy of Ashley County that was the moving force behind the constitutional violation at issue. *See Bechtel*, 250 F.3d at 1160; *Audio Odyssey, Ltd. v. Brenton First Nat'l. Bank*, 245 F.3d 721, 741-42 (8th Cir. 2001); *Lane v. Sarpy County*, 165 F.3d 623, 624 (8th Cir. 1999). Here, Butler presented no evidence that a custom or policy of Ashley County was the moving force behind the alleged constitutional violation.

### Conditions of Confinement

As Butler was a pre-trial detainee, he was "outside the protections of the Eighth Amendment proscription against cruel and unusual punishment, which applies only to convicted prisoners." *Hott v. Hennepin County, Minnesota*, 260 F.3d 901, 905 (8th Cir. 2001). Instead, pre-trial detainees are protected by the Fourteenth Amendment guarantees. *Id. See also Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003).

"Conditions of pretrial confinement are impermissible if they constitute punishment as determined by the due process standards of the Fifth and Fourteenth Amendments." *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996)(*citing, Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). *See also Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*citing Davis v. Hall,* 992 F.2d 151, 152 (8th Cir. 1993) and *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)). "However, because under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment, we apply the identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts."

-47-

*Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005)(internal quotation marks and citations omitted).

The Eighth Amendment requires prison officials to provide humane conditions of confinement. *Aswegan v. Henry*, 49 F.3d 461, 463 (8th Cir. 1995). To state an Eighth Amendment claim the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise." *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(*quoting, Wilson v. Sieter*, 501 U.S. 294, 111 S. Ct. 2321, 2324, 115 L. Ed. 2d 271 (1991)).

This standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted). *See also Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992)(The objective component is "contextual and responsive to contemporary standards of decency.")(quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. (citations omitted). *See also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994). Officials display deliberate indifference if they know of and disregard an excessive risk to inmate safety. *Farmer*, 511 U.S. at 834.

-48-

In this case, Butler testified his unconstitutional conditions of confinement claim is based on the fact that he did not have ready access to drinking water. In particular, Butler points to the lack of water on June 4, 2003. While the daily shift notes do not support the testimony of Culp and Sheriff Robinson that prior to June 4, 2003, the inmates were given water on an hourly basis, they do indicate the inmates were given water at various intervals throughout the day. The testimony also indicated the inmates were given some type of liquid to drink with each meal. For instance, on May 25, 2003, the daily shift notes indicate the inmates were provided with water and/or fed at the following times: 00:39 (water to BP3); 1:29 (water to main bull pens); 4:18 (water to BP3); 6:56 (fed BP3); 9:50 (water for main bull pens); 12:35 (fed and water BP3); 19:27 (fed main bull pens); 22:06 (water to main bull pens). On May 29, 2003, the daily shift notes indicate the inmates were provided with water and/or fed at the following times: 00:23 (water to main bull pens); 3:29 (water to main bull pens); 6:38 (fed main bull pens); 8:26 (water to BP3); 9:04(water to main bull pens); 12:16 (served lunch); 15:05 (water to main bull pens); 19:11 (served chow); 20:15 (water to main BP area); 22:38 (water to main bull pens); and 23:54 (water to main BP).

The daily shift notes for June 1, 2003, indicate the following: 00:22 (water to main bull pens); 7:22 (fed BP3); 12:00 (fed main bull pens); 18:28 (fed chow); 19:21 (fed seconds); 21:32 (water to main bull pens); and 22:55 (water to BP3). The daily shift notes on June 3, 2003, indicate the following: 6:55 (fed breakfast); 7:23 (fed chow to main bull pens); 15:30 (water); 15:45 (main BP water); 17:00 (water); 18:59 (fed and water main BP3); 22:20 (water to main BP); 22:44 (water to all BP).

AO72A
(Rev. 8/82)

On June 4, 2003, the daily shift notes reflect the following:  breakfast was served at 6:35; the inmates were fed again at 12:19; at 16:30 the camera was covered and it was determined BP3 would have no visitation for two weeks; at 16:49 the inmates in BP3 were given water; at 17:19 it was determined BP3 should also have the phone turned off until further notice; at 19:18 BP3 was fed through the bean hole; at 20:03 a note was made that the inmates in BP3 were planning and uprising and would not cooperate with the deputies; and at 23:17 a note was made that a report would be written on all the happenings.

At the hearing, the testimony was that the inmates had been given breakfast.  No testimony established that the inmates received other meals that day.  Certainly, all former inmates that testified indicated they were not brought water for a significant period of time during that day.  In fact, Sivils, Thompson, and Butler testified they did not get water that day.  However, Butler conceded they had water with breakfast but he believed it was warm water left over from the evening before.

Butler, Sivils and Thompson testified that the June 4th incident occurred because the inmates did not get drinking water.  Sheriff Robinson and Culp testified they did not know the incident was over drinking water.  Culp indicated he believed the problem was the inmates covering up the camera.  However, Frierson, who was only at the facility for a limited period of time, testified he had heard the incident was all over water.

Regardless of what caused the June 4th incident, no evidence suggests that Butler became dehydrated on June 4, 2003, or on any other date during his incarceration at the ACJ, from his lack of access to drinking water or that the water provided was unsafe to drink.  The testimony

-50-

suggested there were times when water was left in the cell overnight. However, Butler testified this water was warm and he didn't want to drink warm water.

While it appears the water was not brought around as frequently as Sheriff Robinson and Culp testified it was prior to June 4, 2003, an examination of the daily shift notes indicates inmates had access to drinking water several times a day in addition to being provided with a liquid of some type to drink with each meal. Butler made no argument that his fluid intake over a period of time was inadequate or that, other than June 4th, there were times when he went for significant periods of time without access to drinking water. While it may have been inconvenient to have to wait for the jailers to bring drinking water, we do not believe Butler has established that the defendants acted with deliberate indifference or that they deliberately deprived Butler of necessary drinking water.

### III. CONCLUSION

I therefore recommend that judgment be entered in the defendants' favor and the complaint be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of September 2005.

/s/ Bobby E. Shepherd
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)